UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(WEST PALM BEACH DIVISION)

AMERISURE INSURANCE COMPANY, a Michigan
Corporation and AMERISURE MUTUAL          CASE NO.: 09-81213-CIV-MARRA/JOHNSON
INSURANCE COMPANY, a Michigan Corporation,

        Plaintiffs,

v.

ALBANESE POPKIN THE OAKS DEVELOPMENT,
L.P., and ALAN GODDARD and ANNETTE
GODDARD,

        Defendants/Third Party Plaintiffs.
_____/

**CROSS-MOTION OF DEFENDANTS/COUNTER-PLAINTIFFS
ALAN AND ANNETTE GODDARD FOR SUMMARY JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(C)
AND LOCAL RULE 7.5 DECLARING THAT THE AMERISURE
PLAINTIFFS ARE OBLIGATED TO PROVIDE A DEFENSE TO ALBANESE**

        Defendants and Counter-Plaintiffs ALAN GODDARD and ANNETTE GODDARD (hereafter, the "Goddards"), by and through their undersigned counsel, hereby move for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) and Southern District of Florida Local Rules 7.1.C and 7.5 against Plaintiffs AMERISURE INSURANCE COMPANY and AMERISURE MUTUAL INSURANCE COMPANY (collectively, "Amerisure") declaring that the Amerisure entities are required to provide a defense to Co-Defendant ALBANESE POPKIN THE OAKS DEVELOPMENT, L.P., and, in support thereof, allege as follows:

**The Underlying Action**

        1.   Alan and Annette Goddard are the Plaintiffs in an underlying class action lawsuit styled <u>Alan Goddard, et al., v. Albanese-Popkin The Oaks Development, L.P., et al.</u>, Case No. 502009 CA 020475 5XXXX ME, which is currently pending in the Circuit Court of the 15th Judicial Circuit in

and for Palm Beach County, Florida (hereafter, the "Underlying Action"). A copy of the extant complaint in the Underlying Action (the "Underlying Complaint") is annexed hereto as "**Exhibit A.**"

2. The Underlying Action is also the subject of an unopposed motion for permissive intervention within two separate omnibus class actions styled <u>Wiltz, et al. v. Beijing New Building Materials Public Limited Co.</u>, Case No. 10-932, Sec. L, Mag. 2 ("Omni II") and <u>Rogers, et al. v. Knaupf Gips KG, et al.</u>, Case No. 10-362, Sec. L, Mag. 2 ("Omni IV") which are part of the Chinese drywall Multi-district Litigation ("MDL 2047") presently before Judge Eldon Fallon in the Eastern District of Louisiana.

3. The Underlying Complaint alleges that the Goddards and co-Defendant and co-Counter-Plaintiff herein, Albanese-Popkin The Oaks Development, L.P. ("Albanese"), entered into a purchase and sale agreement for the construction of the Goddards' residence located at 17865 Monte Vista Drive, Boca Raton, Florida 33496 (the "Residence"). Underlying Complaint, Exhibit A hereto, at ¶¶ 5, 9.

4. The Underlying Complaint alleges that the Goddards and Albanese "entered into an 'Agreement of Purchase and Sale' [] for the construction and sale of the Residence on or about November 23, 2004." Underlying Complaint, Exhibit A hereto, at ¶ 9.

5. The Underlying Complaint alleges that the Goddards moved into the Residence on or about October 6, 2006. Underlying Complaint, Exhibit A hereto, at ¶ 26.

6. The Underlying Complaint alleges that, during construction of the Residence, "Chinese drywall" was installed by Albanese's drywall subcontractor. Underlying Complaint, Exhibit A hereto, at ¶¶ 27-28.

7. The Underlying Complaint makes the following specific allegations with respect to the Chinese drywall installed in the Residence:

> 26. On or about October 6, 2006, Plaintiffs moved into their newly-constructed home in the Albanese development known as "The Oaks of Boca Raton" in Boca Raton.

27. OCD [Ocean Coast Drywall] performed all the drywall installation in the Building.

28. OCD installed what is commonly referred to as Chinese drywall in the Building.

29. Chinese drywall is universally regarded as being defective, either by its composition, manufacturing process, or both.

30. OCD purchased the Chinese drywall either directly or indirectly from various suppliers, including, but without limitation, from Defendants Banner, Cemex and Seacoast (collectively referred to herein as the "Suppliers").

31. The Suppliers purchased, directly and/or indirectly, Chinese drywall that was manufactured in China.

32. After OCD purchased the Chinese drywall from one or more of the Suppliers, it was in possession of such product until it installed same in the Building.

33. Property damage was sustained to and within the Building and caused by the release of gases, fumes, and/or vapors from the Chinese drywall brought into the Building in connection with operations being performed on behalf of Albanese by its subcontractor, OCD.

34. Specifically, OCD brought Chinese drywall into the Building in connection with its operations as the installer of the drywall on behalf of Albanese.

35. In reaction to the humidity indigenous to the South Florida climate, sulfuric compounds contained within the Chinese drywall (including one or more of hydrogen sulfide, carbonyl sulfide, and carbon disulfide) released gases, fumes, and/or vapors from the Chinese drywall into the indoor air of the Building.

36. This resulted in a sulfur odor, which could be smelled by the occupants variously throughout the Building and eventually permeated the Building.

37. The release of gases, fumes, and/or vapors from the Chinese drywall brought into the Building in connection with operations being performed on behalf of Albanese by its subcontractor, OCD, caused and created property damage and/or structure damage to the Building including corrosion on outlet boxes, air conditioning coils, electrical wiring, metals, plumbing fixtures, and the aforementioned sulfur odor which permeated the Building.

38. Plaintiffs initially discovered damage to the air conditioning coils in one of the seven air handling units ("AHUs") in the Building and first began to notice a periodic sulfur odor in the Building as early as December, 2006. The periodic sulfur odor continued unabated.

39. Throughout 2008, damage was discovered to certain other AHUs in the Building. By Summer, 2009, all seven AHUs had failed due to coil damage.

      40.    Plaintiffs did not discover the damage to electrical wiring, metals, and plumbing fixtures until some time between April and May, 2009.

      41.    Also in or about April to May, 2009, the sulfur odor in the Building became dramatically more pronounced. So much so that, from that point forward, it permeated the Building on an ongoing basis and could be smelled on clothing and skin after leaving the Building.

      42.    Not until some time between April to May, 2009 was Albanese first notified of the property damage to the Building, including the failure of all seven AHUs, the damage to electrical wiring, metals, and plumbing fixtures, and the sulfur odor that permeated the Building.

      43.    Soon thereafter, the Building was inspected for the presence of Chinese Drywall.

      44.    Not until the Summer of 2009 did the Plaintiffs discover the cause of the property damage referenced above – namely, the Chinese Drywall installed within the Building.

      45.    The Chinese drywall installed in the Building was, at the time it left the Suppliers' hands, in a condition not intended or expected by OCD, Albanese, or the Plaintiffs, and was defective and unreasonably dangerous to the Plaintiffs and to the Plaintiffs' property.

      46.    The release of gases, fumes and/or vapors from the Chinese drywall brought into the Building in connection with operations being performed on behalf of Albanese by its sub-contractor, OCD, has been a continuous occurrence and/or repeated exposure to substantially the same generally harmful conditions since such drywall was brought into the Building and/or installed.

Underlying Complaint, Exhibit A hereto, at ¶¶ 26-46.

**Amerisure's Commercial General Liability Policy Coverage**

      8.    On January 16, 2008, Amerisure issued a form Commercial General Liability (hereafter, "CGL") policy bearing policy number GL 2051427000000 (the "Amerisure CGL Policy") to Albanese, which includes Commercial General Liability coverage for bodily injury and property damage. See Amerisure's Second Amended Complaint herein (the "Amerisure Complaint"), a true and correct copy of which is annexed hereto as "**Exhibit B**," at Exhibit D thereto. The Amerisure CGL Policy was effective from January 16, 2008 through January 15, 2009.

9. The Amerisure CGL Policy was renewed under Policy No. GL 2051427010009 for an additional term effective from January 16, 2009 to January 16, 2010. See Amerisure Complaint, Exhibit B hereto, at Exhibit E thereto.

10. Amerisure also issued an umbrella policy to Albanese bearing policy number CU 2051428 (the "Amerisure Umbrella Policy") also providing coverage for bodily injury and property damage. See Amerisure Complaint, Exhibit B hereto, at Exhibit F thereto. The effective period of the Umbrella Policy is from January 16, 2009 to January 16, 2010. Id. Collectively, the Amerisure CGL Policy and Amerisure Umbrella Policy shall be referred to herein as the "Amerisure Policies."

11. The CGL coverage part of the Amerisure CGL Policy provides in relevant part:

**SECTION I – COVERAGES**

**COVERAGE A.        BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages caused because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

   b. This insurance applies only to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period . . .

12. The Amerisure CGL Policy contains the following pertinent exclusions and exceptions thereto:

2. **Exclusions**

   f. Pollution

      (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants". . . .

            (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's

> behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, **this subparagraph does not apply to: . . . (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor**. (emphasis supplied).

j.  Damage To Property

"Property damage" to:

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . .

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k.  Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

l.  Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

13. The Amerisure CGL Policy contains an amendatory endorsement to exclusion f., the pollution exclusion, entitled "Total Pollution Exclusion With A Building Heating, Cooling And Dehumidifying Equipment Exception, Hostile Fire Exception, And Contractor Job Site Exception," which provides as follows:

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

All of the terms, provisions, exclusions, and limitations of the coverage form apply except as specifically stated below.

Exclusion f. under Paragraph 2., Exclusions of Section I -- Coverage A -- Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

    f.    Pollution

        (1)    "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at anytime.

**This exclusion does not apply to**:

    (a)    "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

    (b)    "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

        (i)    At any premises, site or location which is or was at any time used by or for any insured, or others for the handling, storage, disposal, processing or treatment or waste; or

        (ii)    At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

    (c)    **"Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor.** (emphasis supplied).

    14.    The Amerisure CGL Policy contains the following pertinent definitions:

**SECTION V – DEFINITIONS**

    3.    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

    13.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

    15.    "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed.

         (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

         (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

17. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that, is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

21. "Your Product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name;

         (c) A person or organization whose business or assets you have acquired; and . . .

-8-

  b.  Includes:

    (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    (2) The providing of or failure to provide warnings or instructions.

22. "Your work":

  a.  Means:

    (1) Work or operations performed by you or on your behalf; and

    (2) Materials, parts or equipment furnished in connection with such work or operations.

  b.  Includes:

    (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    (2) The providing of or failure to provide warnings or instructions.

15. The Umbrella Policy (Form CU 00 01 12 07) provides in pertinent part:

**SECTION I – COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

  a. We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

  b. This insurance applies only to "bodily injury" and "property damage" only if:

    (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

    (2) The "bodily injury" or "property damage" occurs during the policy period . . .

      16. The Umbrella Policy contains the following pertinent exclusions and exceptions thereto:

**2.**    **Exclusions**

    i.    Pollution

        (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants". . . .

        (2) "Pollution cost or expense". This exclusion does not apply if valid "underlying insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". Coverage provided will follow the provisions, exclusions and limitations of the "underlying insurance".

    m.    Damage To Property

        "Property damage" to:

        (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

        (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . .

        Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

    n.    Damage To Your Product

        "Property damage" to "your product" arising out of it or any part of it.

    o.    Damage To Your Work

        "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

        This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

      17. The Amerisure Umbrella Policy contains the following amendatory endorsements, which provide, in part:

**TOTAL POLLUTION EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL LIABILITY UMBRELLA COVERAGE PART**

Exclusion i. under Paragraph 2., Exclusions of Section I – Coverage A -- Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

    i.    Pollution

        (1)    "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

        (2)    "Pollution cost or expense."

*   *   *

EXCLUSION – DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS ON YOUR BEHALF

This endorsement modifies insurance provided under the following:

**COMMERCIAL LIABILITY UMBRELLA COVERAGE PART**

Exclusion o. of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**o. Damage To Your Work**

"Property Damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

    18.    The Umbrella Policy contains the following Definitions:

**SECTION V - DEFINITIONS**

    3.    "Bodily injury" means bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury."

    13.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

    15.    "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "'Pollution cost or expense" means any loss, cost or expense arising out of any:

    a. Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants;" or

    b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants."

17. "Products-completed operations hazard":

    a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
        (1) Products that are still in your physical possession; or

        (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            (a) When all of the work called for in your contract has been completed.

            (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

18. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

-12-

24. "Underlying insurance" means any policies of insurance listed in the Declarations under the Schedule of "underlying insurance."

27. "Your Product":

    a.      Means:

        (1)      Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            (a) You;

            (b) Others trading under your name;

            (c) A person or organization whose business or assets you have acquired; and . . .

    b.      Includes:

        (1)      Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        (2)      The providing of or failure to provide warnings or instructions.

28. "Your work":

    a.      Means:

        (1)      Work or operations performed by you or on your behalf; and

        (2)      Materials, parts or equipment furnished in connection with such work or operations.

    b.      Includes:

        (1)      Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

        (2)      The providing of or failure to provide warnings or instructions.

**Amerisure's Communications With Albanese Under The Amerisure Policies**

19. On June 26, 2009, Amerisure issued a reservation of rights letter to Albanese. The June 26, 2009 letter included references to certain provisions of the Amerisure Policies upon which Amerisure's reservation of rights was predicated. A true and correct copy of the June 26, 2009 letter is annexed to the Amerisure Complaint, Exhibit B hereto, at Exhibit B.

20. On July 9, 2009, Amerisure issued a letter to Albanese formally denying coverage for the Underlying Action based on the application of the Total Pollution Exclusion endorsement in the CGL Policies. A true and correct copy of the July 9, 2009 letter is annexed to the Amerisure Complaint, Exhibit B hereto, at Exhibit D.

**The Parties' Respective Interpretations Of The Policies**

    A.    **Amerisure's Interpretation Of The Policy**

21. Amerisure contends that the Total Pollution Exclusion, as contained in the Amerisure Policies, unambiguously excludes from coverage bodily injury or property damage which would not have occurred in whole or part but for the discharge or release of pollutants. Amerisure Complaint, Exhibit B hereto, at ¶¶ 42-46.

22. Amerisure contends that the Underlying Action seeks damages as a result of off-gassing of sulfur compounds within the Chinese drywall and the migration of such sulfur compounds within the indoor air of the Goddards' Residence. Amerisure Complaint, Exhibit B hereto, at ¶¶ 42-46.

23. Amerisure contends that sulfur compounds as alleged in the Underlying Action constitute pollutants under the Amerisure Policies, and the damages alleged therein therefore fall within the Total Pollution Exclusion. Amerisure Complaint, Exhibit B hereto, at ¶¶ 42-46.

24. Amerisure then concludes that, as a result, it has no duty to defend or indemnify Albanese for any of the claims asserted in the Underlying Action. Amerisure Complaint, Exhibit B hereto, at ¶¶ 42-46.

    B.    **The Goddards' Interpretation Of The Policies**

25. The Goddards' interpretation of the Policies is set forth in their Second Amended Answer & Counterclaim, a copy of which is annexed hereto as **"Exhibit C."** The Goddards contend that a clear-cut exception to the Total Pollution Exclusion in the primary Amerisure policy eliminates the application of the TPE to the facts as pled in the Underlying Action. This **exception to the TPE endorsement** reads:

> **This exclusion does not apply to: . . . (c) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor.**

See Amerisure Complaint, Exhibit E at ¶ p. CG 71030106 (emphasis supplied); the Goddards' Second Amended Answer & Counterclaim, a copy of which is annexed hereto as **"Exhibit C,"** at ¶¶ 16-17, 27-28.

26. Paragraph 33 of the Underlying Complaint fits squarely and unambiguously within this exception, and reads:

> 33. Property damage was sustained to and within the Building and caused by the release of gases, fumes, and/or vapors from the Chinese drywall brought into the Building in connection with operations being performed on behalf of Albanese by its subcontractor, OCD.

Underlying Complaint, ¶ 33.

27. Accordingly, Amerisure may not deny coverage on the basis of the TPE endorsement, and is obligated to provide Albanese with indemnification and a defense.

28. Without the benefit of the TPE endorsement, Amerisure's duty to provide coverage is demonstrated by the doctrine of two recent Florida Supreme Court cases – U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So.2d 871 (Fla. 2007) and Auto-Owners Ins. Co. v. Pozzi Window Co., 984 So.2d 1241 (Fla. 2008) – which mandate that Amerisure must provide coverage to Albanese herein.

29. The odor inherent in the Chinese drywall in the Goddards' residence permeating the building constitutes physical injury to the property under the Amerisure CGL policies.

30. Lastly, the "trigger" for coverage under the Amerisure CGL policies is when the damage occurs, and, if the damage is continuously occurring, the trigger is the time when the damage manifests itself or is discovered.

31. The Underlying Complaint alleges that the majority of the damage manifested itself and was discovered by the Goddards from early to mid 2009, Underlying Complaint, ¶¶ 39-44, within the

coverage period under the 2009-10 renewal of the Amerisure Policies.  See Amerisure Complaint, Exhibit B hereto, at Exhibit E thereto.

**Findings Of Fact And Conclusions Of Law Pertaining To Chinese Drywall**

32. On April 8, 2010, in <u>Germano, et al. v. Taishan Gypsum Co. Ltd., et al.</u>, Case No. 09-6687, an individual action consolidated within the Chinese drywall MDL 2047, Judge Fallon rendered Findings of Fact and Conclusions of Law regarding the Chinese drywall at issue in this and all other Chinese drywall cases within and without the MDL.

33. Judge Fallon reached the following findings and conclusions:

Chinese drywall is different from typical, benign drywall for the following reasons:

1. Chinese drywall has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur.

2. Chinese drywall releases reduced sulfur gases. The three main gases that are released from CDW are hydrogen sulfide (H2S), carbonyl sulfide (COS), and carbon disulfide (CS2). The CDW also releases elemental sulfur. The Plaintiffs' experts have detected reduced sulfur gas emissions by conducting laboratory tests on samples of Chinese drywall. These emissions are also confirmed by strong odors. The fact that Chinese drywall emits sulfur gases has also been reported by the U.S. Consumer Products Safety Commission, the Florida Department of Health, and other investigatory agencies and firms.

3. The sulfur gases released by Chinese drywall are irritating to the human body. Exposed individuals reported irritation of the eyes, respiratory system, and skin, among other things.

4. The sulfur gases released by Chinese drywall cause offending odors in homes, making them hard if not impossible to live in.

5. The sulfur gases released by Chinese drywall are corrosive to metals, particularly copper and silver. "Corrosion" is defined by the ASTM as the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties.  Copper and silver metal components in the Plaintiffs' houses are extremely vulnerable to corrosion from exposure to the sulfur gases.  The sulfur gases, in reacting with metals, form sulfide deposits on the surfaces of the metals. For example, a reaction of sulfur gases with copper pipes will form copper sulfide on the metals.  The reaction of sulfur gases with metals can be said to be "consuming" the useful, pure metals by replacing those metals with sulfides. Mr. Galler as an expert in the fields of electrical engineering, power electronics, electrical machinery, and failure analysis.

6. The corrosion on metals caused by the sulfur gases emitted by Chinese drywall causes premature failure of electrical & mechanical devices. The Plaintiff-intervenors

> have reported many premature failures of major appliances and consumer electronics in their homes during their first three years of use of these homes. Laboratory analysis of these copper and silver components from the Virginia homes identified the corrosion as the cause of an HVAC coil failure and severe corrosion deposits at the operative connections in the appliances and in consumer electronics. Mechanical, electrical, and electronic failures have been shown to have occurred prematurely due to the severe industrial corrosive environments in these Chinese Drywall homes. Evaluation of comparable HVAC systems, appliances, and electronics in *control* homes (e.g., similar homes without Chinese Drywall) do not show premature failures of HVAC systems, appliances, and electronics, and the wires do not have corrosion product thicknesses that would predict premature failures.
>
> 7. The corrosion on metals caused by the sulfur gases emitted by Chinese drywall poses a fire risk. The corrosion increases resistance in the circuitry of appliances and electronics. Increased resistance increases heat in appliances and electronics. This increased resistance can cause excessive heating of the connection when energized. Complete failure of a switch can lead to fires or other life safety problems, depending on the intended function of the switch.
>
> Knauf Plasterboard Tianjin (hereinafter "Knauf" or "KPT") and Plaintiffs Steering Committee (hereinafter "PSC") experts agree that all of the problematic Chinese drywall products share similar chemical and physical properties.

Germano, et al. v. Taishan Gypsum Co. Ltd., et al.**,** ___ F.Supp.2d ___, 2010 WL 1445684, *5 to *7 (E.D.La. April 8, 2010) (internal citations omitted).

34. This Court can and should take judicial notice of these findings and conclusions, given Judge Fallon's position as the presiding judge in the Chinese drywall MDL, if not give them preclusive effect. See In re Agent Orange Product Liability Litigation, 996 F.2d 1425, 1431 (2nd Cir. 1993) ("The district court was not determining simply the preclusive effect of a prior final judgment on claims or issues expected to be raised in subsequent collateral proceedings; it was enforcing an explicit, ongoing order against relitigation of matters it already had decided, and guarding the integrity of its rulings in complex multidistrict litigation over which it had retained jurisdiction.").

**WHEREFORE,** Defendants/Counter-Plaintiffs ALAN GODDARD and ANNETTE GODDARD request entry of an Order granting summary judgment against Plaintiffs/Counter-Defendants AMERISURE INSURANCE COMPANY and AMERISURE MUTUAL INSURANCE COMPANY declaring that the Amerisure entities are required to provide a defense under the Policies, together with any other further relief this Court deems just and proper.

        **Respectfully Submitted,**

        **SCOTT N. GELFAND, P.A.**
        5501 University Drive, Suite 101
        Coral Springs, Florida 33067
        (954) 255-7900 (Telephone)
        (954) 255-7905 (Fax)

        By: /s/ Scott N. Gelfand
        Scott N. Gelfand, Esq.
        Florida Bar No. 0538711

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that a true and correct copy of the foregoing document was served on June 7, 2010 by notice of electronic filing in lieu of mailing to:

Josh Levy, Esq.
JOSEPH JACK
P.O. Box 330519
Miami, FL 33233-0519
Telephone: (305) 445-3800
Facsimile: (305) 448-5800

Lysa M. Friedlieb, Esq.
SACHS SAX CAPLAN
6111 Broken Sound Parkway, N.W., Suite 200
Boca Raton, FL 33487
Telephone: (561) 994-4499
Facsimile: (561) 994-4985

        By: /s/ Scott N. Gelfand
            Florida Bar No. 0538711