UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-81213-CIV-MARRA

AMERISURE INSURANCE COMPANY, a
Michigan corporation and AMERISURE
MUTUAL INSURANCE COMPANY, a
Michigan corporation,

      Plaintiffs,

vs.

ALBANESE POPKIN THE OAKS
DEVELOPMENT GROUP, L.P., ALAN
GODDARD and ANNETTE GODDARD,

      Defendants.
_____/

## OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court on Plaintiffs' Amerisure Insurance Company and

Amerisure Mutual Insurance Company, (collectively "Plaintiffs" or "Amerisure") Motion for

Summary Judgment [DE 45], and Defendants' Alan Goddard and Annette Goddard ("the

Goddards") Cross-Motion for Summary Judgment [DE 86].  The motions are fully briefed and

ripe for review.  The Court has reviewed the motions, responses, and replies, the entire file in this

case, and is otherwise duly advised in the premises.

### I. Undisputed Material Facts

Plaintiff Amerisure initiated the present against Defendants Albanese Popkin the Oaks

Development Group, L.P., Alan Goddard, and Annette Goddard seeking a declaratory judgment

that it is not liable either to defend or indemnify the Defendants in connection with a lawsuit

pending in a Florida state court. [DE 38].  Alan Goddard and Annette Goddard brought an action

in a Florida state court against Albanese-Popkin the Oaks Development Group, L.P., the builder

of their home, as well as against the drywall subcontractor and the distributors of the drywall, for

damages arising from the installation of Chinese drywall [DE 45, Exhibit F].  According to the

exhibit attached to their Second Amended Complaint, the Goddards and Albanese Popkin

entered an "Agreement of Purchase and Sale" for the construction and sale of the house on or

about November 23, 2004 [DE 45, Exhibit D]. The Goddards moved into their newly-constructed

home on or about October 6, 2006 [DE 39-1 ¶ 26].  In their Second Amended Complaint against

Albanese Popkin, the Goddards alleged that,

> 33.  Property damage was sustained within the Building and caused by the release
> of gases, fumes, and/or vapors from the Chinese drywall brought into the Building
> in connection with operations being performed on behalf of the Albanese by its
> subcontractor, OCD.
>
> 34.  Specifically, OCD brought Chinese drywall into the Building in connection
> with its operations as the installer of the drywall on behalf of Albanese.
>
> 35.  In reaction to the humidity indigenous to the South Florida climate, sulfuric
> compounds contained within the Chinese drywall (including one or more of
> hydrogen sulfide, carbonyl sulfide, and carbon disulfide) released gases, fumes,
> and/or vapors from the Chinese drywall into the indoor air of the Building.
>
> 36.  This resulted in a sulfur odor, which could be smelled by the occupants
> variously throughout the Building and eventually permeated the Building.
>
> 37.  The release of gases, fumes, and/or vapors from the Chinese drywall brought
> into the Building in connection with operations being performed on behalf of
> Albanese by its subcontractor, OCD, caused and created property damage and/or
> structure damage to the Building including corrosion on outlet boxes, air
> conditioning coils, electrical wiring, metals, plumbing fixtures, and the
> aforementioned sulfur odor which permeated the Building.
>
> 38.  Plaintiffs initially discovered damage to the air conditioning coils in one of
> the seven air handling units ("AHUs") in the Building and first began to notice a

periodic sulfur odor in the Building as early as December, 2006.  The periodic sulfur odor continued unabated.

39.  Throughout 2008, damage was discovered to certain other AHUs in the Building.  By Summer, 2009, all seven AHUs had failed due to coil damage.

40.  Plaintiffs did not discover the damage to electrical wiring, metals, and plumbing fixtures until some time between April and May, 2009.

41.  Also in or about April to May, 2009, the sulfur odor in the Building became dramatically more pronounced.  So much so that, from that point forward, it permeated the Building on an ongoing basis and could be smelled on clothing and skin after leaving the Building.

42.  Not until some time between April to May, 2009 was Albanese first notified of the property damage to the Building, including the failure of all seven AHUs, the damage to electrical wiring, metals, and plumbing fixtures, and the sulfur odor that permeated the Building.

***

44.  Not until Summer of 2009 did the Plaintiffs discover the cause of the property damage referenced above–namely, the Chinese Drywall installed within the Building.

***

[DE 39-1]

## II.  The Policies

Amerisure issued a commercial general liability insurance policy, number GL 2051427000000, to Albanese Popkin for the policy period of January 16, 2008, through January 16, 2009. [DE 45, Exhibit G-H].  Amerisure issued a commercial general liability insurance policy, number GL 2051427010009, to  Albanese Popkin for the policy period of January 16, 2009, through January 16, 2010.  [DE 45, Exhibit G-H].  Below are the relevant policy provisions from the two insurance policies:

**SECTION I–COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY**
**DAMAGE LIABILITY**

3

**1. Insuring Agreement**

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damaged because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit"seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:

***

    **b.**  This insurance applies to "bodily injury" and "property damage" only if:

        **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

        **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II**–Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

    **c.**  "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II**–Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

    **d.**  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section   **II**–Who Is An Insured or any

4

"employee" authorized by you to give or receive notice of an "occurrence" or claim:

> **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

> **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

> **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.
>
> \*\*\*

**SECTION V–DEFINITIONS**

\*\*\*

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\*\*\*

**17.** "Property damage" means:

> **a.** Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
>
> \*\*\*

Amerisure also issued two umbrella liability insurance policies to Albanese Popkin with policy number CU 2051428; one has a policy period of January 16, 2008, through January 16, 2009, and the second has a policy period of January 16, 2009, through January 16, 2010. [DE 45, Exhibit I-J] The language in these policies is virtually identical to the provisions listed above, and any differences are not relevant to our analysis.

## III.  Standard of Review

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

5

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."   Fed. R. Civ. P. 56( c).  The moving party bears the initial responsibility of

showing the court, by reference to the record, that there are no genuine issues of material fact that

should be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the non-

moving party bears the burden of proof on an issue, the moving party may discharge its burden

by showing that the materials on file demonstrate that the party bearing the burden of proof at

trial will not be able to meet its burden.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th

Cir. 1991).

     When a moving party has discharged its burden, the nonmoving party must "go beyond

the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and

admissions on file," designate specific facts showing there is a genuine issue for trial.  *Celotex,*

477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts."  *Matsushita Electr. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986).  When deciding whether summary judgment is appropriate, the

Court must view the evidence and all reasonable factual inferences therefrom in the light most

favorable to the party opposing the motion.  *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369

(11th Cir. 1998) (citations and quotations omitted).

     This Court may not decide a genuine factual dispute at the summary judgment stage.

*Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues

are present, the court must deny the motion and proceed to trial." *Warrior Tombigbee Transp.*

*Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material

fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990).  However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir.1989).

## IV.  Discussion

Because the Court is sitting in diversity, Florida substantive law applies.  *See, e.g., Admiral Ins. Co. v. Feit Mgmt. Co.*, 321 F. 3d 1326, 1328 (11th Cir. 2003) ("Sitting in diversity, we apply the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result.").

### A.  General Rules Regarding Insurance Policy Interpretation

Under Florida law, the interpretation of an insurance policy is a question of law for the court.  *Technical Coating Applicators, Inc. v. U.S. Fid. & Guar. Co.*, 157 F.3d 843 (11th Cir. 1998); *Arnold v. Life Ins. Co. of N. Am.*, 894 F.2d 1566 (11th Cir. 1990); *Penzer v. Transp. Ins. Co.*, 29 So.3d 1000 (Fla. 2010).  As a basic premise, clear and unambiguous policy terms should be given their plain, ordinary, and generally accepted meaning.  *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So.2d 528 (Fla. 2005); *Union Am. Ins. Co. v. Maynard*, 752 So.2d 1266 (Fla. 4th DCA 2000).  However, in applying the "plain meaning" rule, courts must not construe insurance policy provisions in isolation, but instead should read all terms in light of the policy as a whole, with every provision given its full meaning and operative effect.  *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29 (Fla. 2000); *First Prof'ls Ins. Co. v. McKinney*, 973 So.2d 510 (Fla. 1st DCA 2007).

Ambiguous policy provisions are to be liberally construed in favor of the insured and

against the insurer, as drafter of the contract. *Dickson v. Econ. Premier Assur. Co.*, 36 So.3d 789 (Fla. 5th DCA 2010). Policy language is considered to be ambiguous if it is susceptible to more than one reasonable interpretation–one providing coverage and another limiting coverage. *Garcia v. Fed. Ins. Co.*, 969 So.2d 288 (Fla. 2007); *Flores v. Allstate Ins. Co.*, 819 So.2d 740 (Fla. 2002). "The rule of adverse construction" is a "secondary rule of interpretation" or a "rule of last resort," which should not be used if the parties' intent can otherwise be determined from a plain reading of the policy. *Emerald Pointe Prop. Owners' Ass'n, Inc. v. Commercial Constr. Ind.*, 978 So.2d 873, 878 n. 1 (Fla. 4th DCA 2008).

In order for a court to find in favor of the insured under the rule of *contra proferentem*, the policy must actually be ambiguous, which means that it must have a genuine inconsistency, uncertainty, or ambiguity in meaning after the court has applied the ordinary rules of construction. *Taurus Holdings* at 532; *Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So.2d 1135 (Fla. 1998). The lack of a definition of an operative term does not, by itself, create an ambiguity. *See State Farm & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072 (Fla. 1998). Additionally, a contract provision is not considered to be ambiguous simply because it is complex and requires analysis to interpret it. *Garcia* at 291; *Swire Pacific Holdings Inc. v. Zurich Ins. Co.*, 845 So.2d 161 (Fla. 2003).

Furthermore, pursuant to Florida law, the burden is on the insured to prove that a claim is covered by the insurance policy. *Mid-Continent Cas. Co. v. Frank Casserino Constr., Inc., and CED Constr. Partners, Ltd.*, -- F. Supp.2d --, 2010 WL 2431900, \*4 (M.D. Fla. 2010) (citing *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997)). If the insured shows the existence of coverage, the insurer has the burden of proving any applicable exclusions.

*Id.*

## B. <u>Policy Period Issue</u>

There are four trigger of coverage theories that are generally accepted: exposure, manifestation, continuous trigger, and injury in fact. *Assurance Co. of America v. Lucas Waterproofing Co., Inc.*, 581 F.Supp.2d 1201, 1206 (S.D. Fla. 2008); *Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.*, 227 F.Supp.2d 1248, 1266 (M.D. Fla. 2002). Florida courts follow the "general rule that the time of occurrence within the meaning of an 'occurrence' policy is the time at which the injury first manifests itself." *Auto Owners,* 227 F.Supp.2d at 1266 (citing *Am. Motorists Ins. Co. v. S. Sec. Life Ins. Co.*, 80 F.Supp.2d 1280, 1284 (M.D. Ala. 2000)); *see also Assurance Co.*, 581 F.Supp.2d at 1206; *Mid-Continent Cas. Co.*, 2010 WL 2431900 at *5. The policies at hand are in fact "occurrence" policies.

Amerisure argues in its Motion for Summary Judgment that the Goddards first noticed damage and a sulfuric odor stemming from the Chinese drywall in 2006, prior to the inception of Albanese Popkin's insurance policies. As a result, Amerisure contends it is not required to defend or indemnify Albanese Popkin in the Goddards' underlying lawsuit. Albanese Popkin and the Goddards argue that the damage was continuous and that its first manifestation is not the crucial trigger. This Court is required to look solely at the allegations in the complaint filed against the insured in determining Amerisure's duty to defend. *Northland Cas. Co. v. HBE Corp.*, 160 F.Supp.2d 1348, 1360 (M.D. Fla. 2001). According to the allegations in the second amended complaint, the Goddards first noticed a periodic sulfur smell and some damage to the coils in one air handling unit in December 2006. Throughout 2008, the Goddards observed additional damage to other air handling units. By the summer of 2009, all seven air handling

units had failed.  Between April and May 2009, the Goddards discovered damage to the electrical

wiring, metals, and plumbing fixtures and encountered a more pronounced odor.  The Goddards

therefore admitted in their underlying complaint that they first noticed the damage prior to the

policy period.

In *Auto Owners,* 227 F.Supp.2d at 1267, the cause of the property damage at issue was

leaky underground acetone piping that was completed and installed in 1984.  A leak commenced

some time prior to February 1991, when the leak was discovered.  *Id.*  Damage continued to

occur after February 1991 because the acetone in the ground gradually spread.  *Id.*  One of the

insureds made a "continuous trigger" argument to the court and asserted that the manifestation of

the damage fell within the policy period.  The court, however, rejected this argument.  *Id.*  For

purposes of determining whether the insurer had a duty to defend, the court determined that the

trigger for coverage was the initial discovery of the leaking pipe in February 1991 rather than any

later date.  *Id.*

The case of *North River Ins. Co. v. Broward County Sheriff's Office*, 428 F.Supp.2d 1284

(S.D. Fla. 2006), involved an insurance dispute between the North River Insurance Company and

the Broward County Sheriff's Office and a number of its officers.  Two men who were

incarcerated and exonerated filed underlying complaints against the defendants. *Id.* at 1286.  In

determining whether the insurer had a duty to defend, the court noted that it was undisputed that

the two men were neither arrested nor incarcerated during the policy period.  *Id.* at 1288.  The

issue, therefore, was whether the claims alleged in the underlying complaint occurred during the

insurance policy period.  *Id.* at 1288-89.  The insureds argued that there were ongoing injuries to

the two men and that they were exonerated during the period of coverage, so the duty to defend

was triggered.  *Id.* at 1289.  The insurer relied on the manifestation theory for determining when

coverage was triggered.  *Id.*  The court ultimately held that the damage both occurred and

manifested itself well before the policy period, so there was no duty to defend under the policy,

rejecting the continuous trigger theory put forth by the insureds.  *Id.* at 1290-1292.  The holdings

of the cases adopting the manifestation theory are applicable to the facts of this case.

Albanese Popkin's and the Goddards' reliance on *Trizec Properties, Inc. v. Biltmore*

*Const. Co., Inc.*, 767 F.2d 810 (11th Cir. 1985) is misplaced.  In *Trizec*, the court explained that

when dealing with an occurrence policy, the critical inquiry is when did the insured sustain actual

damage.  *Id.* at 812.  Unlike the facts here, the underlying complaint in *Trizec* did not allege

when the damage occurred.  The court found, however, that "the language of the underlying

complaint 'at least marginally and by reasonable implication,' . . . could be construed to allege

that the damage" occurred during the policy period,  even though manifestation of the damage

did not occur until after the policy had expired.  *Id.* at 813.  Because the complaint in the

underlying case was construed to have alleged that the damage occurred during the policy period,

the question of when the damage manifested itself was irrelevant to the analysis.  Thus, the

*Trizec* court explained that it did not need to decide whether the "theory that damages manifest

themselves or be discoverable before coverage is triggered" is a "correct or incorrect statement of

law in general."  *Id.* at 813 n. 6.

*Trizec* is distinguishable from the facts here because the Goddards' underlying complaint

clearly alleged that the damage first occurred prior to the effective date of the insurance policy.

Manifestation of the damage is relevant in this context because it establishes that the Goddards

sustained actual damage before the policy in question became effective.  Therefore, there was no

"bodily injury" or "property damage" during the policy period.

Based on the allegations of the Goddards' complaint in the underlying case, the damages occurred prior to the policy period. The fact that the damage was continuous in nature is irrelevant to the Court's analysis. Therefore, there is no coverage or duty to defend, and Amerisure's Motion for Summary Judgment must be granted.[1]

Furthermore, the two umbrella liability policies issued by Amerisure to Albanese Popkin were "follow form" policies, meaning that they incorporate and adopt the provisions of the underlying policies. *Admiral Ins. Co. v. Rockwell*, 515 So.2d 246, 247 (Fla. Dist. Ct. App. 1987). Therefore, the same analysis applies to the commercial liability policies and the umbrella policies.

## Conclusion

Based on the foregoing, it is hereby ORDERED AND ADJUDGED that Plaintiffs' Amerisure Insurance Company and Amerisure Mutual Insurance Company's Motion for Summary Judgment [DE 45] is GRANTED. It is also hereby ORDERED AND ADJUDGED that Defendants' Alan Goddard and Annette Goddard Cross-Motion for Summary Judgment [DE

---

[1]The Court has reviewed the other issues argued in both the Motion for Summary Judgment and the Cross-Motion for Summary Judgment. As the basis for this Order is that the injury occurred and the damage manifested itself outside the insurance policy period, there is no need to address the parties' arguments regarding the Total Pollutant Exclusion and the exception to the exclusion.

86] is DENIED.

     DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County, Florida, this 30th day of November, 2010.

 

                                     KENNETH A. MARRA
                                     United States District Court

Copies furnished to:
all counsel of record